UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| WILLIAM JAMES RAY, <br><br> Plaintiff, <br><br> v. <br><br> T. WORDEN, et al., <br><br> Defendants. | CAUSE NO. 3:24-CV-449-PPS-APR |

OPINION AND ORDER

William James Ray, a prisoner without a lawyer, filed an amended complaint.[1] ECF 38. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citations omitted). Nevertheless, under 28 U.S.C. § 1915A, I must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

Ray alleges that, on July 1, 2022, he was working in the Miami Correctional Facility ("MCF") kitchen. John Doe, an Aramark employee and kitchen worker, oversaw the part of the kitchen where Ray worked. This included making sure inmates

---

[1] Ray has presented several different amended complaints (ECF 30; ECF 34; ECF 36; ECF 38), but "[w]hen a plaintiff files an amended complaint, the new complaint supersedes all previous complaints and controls the case from that point forward." *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999). Therefore, Ray's amended complaint filed August 12, 2025, (ECF 38) is the operative complaint.

did not assault each other with items found in the kitchen. John Doe found some chicken hidden in the area where Ray worked. Ray represents that inmates who work in the kitchen planned to take the chicken with them back to the dorm, which they would then sell to other inmates. John Doe told the inmates that, because of the chicken found hidden near where Ray works, no one would be allowed to take chicken back to their dorms unless someone confessed to stealing the hidden chicken. Ray asserted that he was innocent. Inmates then threatened to assault him. John Doe allegedly knew of the threats and left the area. Ray was assaulted with metal items from the kitchen. Ray alleges that John Doe deliberately left the area to allow the assault to occur.

The Eighth Amendment imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994 (citation omitted)). When an inmate is attacked by another inmate, the Eighth Amendment is violated only if "deliberate indifference by prison officials effectively condones the attack by allowing it to happen." *Haley v. Gross*, 86 F.3d 630, 640 (7th Cir. 1996). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Exercising poor judgment . . . falls short of meeting the standard of consciously disregarding a known risk to his safety." *Lewis v. Richards*, 107 F.3d 549, 554 (7th Cir. 1997). "[A] complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Gevas v. McLaughlin*, 798 F.3d 475, 481 (7th Cir. 2015).

General requests for help, expressions of fear, and even prior attacks are insufficient to alert guards to the need for action. *Klebanowski v. Sheahan*, 540 F.3d 633, 639–40 (7th Cir. 2008). Giving Ray the benefit of all plausible inferences, he has stated a claim against the John Doe Aramark Employee / Worker present on July 1, 2022.

While the assault was taking place, Jane Doe, another Aramark Employee/Worker assigned to another area of the kitchen, walked in and saw what was happening. She did not tell the inmates to stop, and she did not immediately press her emergency call button. She turned around and tried to leave, but Ray and another inmate fell into her. At that point, she called for backup.

Once an offender is under attack, an officer cannot just stand by and do nothing. *See Borello v. Allison*, 446 F.3d 742, 748-49 (7th Cir. 2006) (noting Eighth Amendment violation can occur where prison official "did not respond to actual violence between inmates"). On the other hand, "correctional officers who are present during a violent altercation between prisoners are not deliberately indifferent if they intervene with a due regard for their safety[.]" *Shields v. Dart*, 664 F.3d 178, 181 (7th Cir. 2011). Ray alleges that Jane Doe did not act quick enough, but she did not do nothing. She called for backup before she was able to leave the room. Therefore, Ray may not proceed on this claim against the Jane Doe Aramark Employee/Worker.

This same Jane Doe defendant wrote a conduct report accusing Ray of assaulting her. Jane Doe claimed that the inmates were merely defending themselves against Ray. The other inmates were not written up for assaulting Ray. He claims this occurred

3

because Jane Doe is white, has made racist remarks in the past, and was involved in an inappropriate relationship with one of the white inmates that was assaulting him.

Allegations of false disciplinary reports do not state a claim where due process is afforded, and Ray does not allege any due process deficiencies occurred following the allegedly false charge. *See Hanrahan v. Lane,* 747 F.2d 1137, 1140–41 (7th Cir. 1984). Therefore, he may not proceed against the Jane Doe Aramark Employee/Worker.

Officers stopped the assault, and Ray was taken to the medical department for treatment. The inmates who allegedly assaulted him, however, were not disciplined. Ray alleges that a John or Jane Doe Aramark Employee/Supervisor knew that the inmates that attacked Ray wanted to attack him again because the inmates were yelling threats at Ray as he was removed from the kitchen. John or Jane Doe Aramark Employee/ Supervisor also knew that, when the inmate kitchen workers left the kitchen, they would need to walk past the medical department where both the supervisor and the inmates allegedly knew Ray was located. One of the inmates who assaulted Ray in the kitchen entered the medical area and stabbed Ray in the leg. Ray contends that, because this risk was known to the John or Jane Doe Aramark Employee/Supervisor, they should have had the inmates that assaulted Ray escorted from the kitchen by custody staff to prevent this attack.

Here, the possibility that an inmate would enter the medical department without a pass to attack Ray a second time after some unspecified amount of time had passed is far too speculative to allow a plausible inference that the John or Jane Doe Aramark Employee/Supervisor consciously disregarded a known risk to Ray's safety. While the

4

supervisor may have exercised poor judgment, that is insufficient to find that he violated Ray's Eighth Amendment rights. Therefore, I will not allow Ray to proceed against the John or Jane Doe Aramark Employee/Supervisor.

Next Ray alleges that a John or Jane Doe Prison Guard/Yard/Sort Officer was responsible for making sure inmates are not on the yard trying to assault people and that the inmates who are on the yard have passes to be some place and are not doing anything illegal. Ray believes that this unidentified officer knew who Ray was, knew that Ray had been taken to the medical department, and knew that a particular inmate present in the yard had assaulted Ray in the kitchen, but still failed to stop the inmate on the yard and escort him to his dorm. These allegations appear to be based on nothing more than speculation. Ray does not know who the individual is or even what gender they were, and yet he claims they knew an awful lot about recent events occurring in the kitchen. Without more, it cannot be plausibly inferred that the John/Jane Doe Prison Guard/Yard/Sort Officer disregarded a known risk of harm to Ray, and I cannot allow this claim to proceed.

Similarly, Ray alleges that a Jane Doe Prison Guard/Medical Officer watched an inmate wearing a hair and beard net walk over from the kitchen to the medical office and allowed him to enter without a pass, causing Ray to be stabbed. Ray speculates that this person also knew that Ray had been assaulted in the kitchen and knew that this person who was entering the medical department would assault Ray again. Here Ray appears to base his conclusions on mere speculation. The facts alleged suggest poor judgment on the part of the Jane Doe Prison Guard/Medical Officer but not deliberate

5

disregard to a known risk. Therefore, Ray may not proceed against the Jane Doe Prison Guard/Medical Officer.

The inmate that attacked Ray told Prison Guard Snow, with the Department of Internal Investigations, that he attacked Ray because he was paid to do so. Ray was temporarily placed in administrative housing for his safety.

On July 6, 2022, Ray had a meeting with the DII review committee, consisting of Prison Guard Snow, Mental Health Professional Beck, Unit Team Manager/Prison Guard Dwyer, Case Manager/Prison Guard Keller, and Lieutenant/Prison Guard Myers. The committee told Ray that he would return to population and be placed in the school dorm to get his GED. They also told Ray that a "keep separate" would be put on the inmate who assaulted and stabbed him so that he would not be attacked again.

Ray moved to the school dorm on July 15, 2022. Around July 25, 2022, the inmate that assaulted and stabbed Ray was placed in the cell right next to Ray's cell. The inmate told Ray that, if he did not write a witness statement saying that he was not the inmate that stabbed Ray on July 1, 2022, he would stab Ray again. Ray wrote the letter, but there was video evidence of the attack, and the inmate was found guilty.

Ray claims the review committee violated his Eighth Amendment rights by not putting a keep separate order in against the inmate who attacked him. While an error clearly occurred, it is unclear that the error was caused by anyone on the review committee. Furthermore, it is unclear who decided to move the inmate next to Ray and if they knew about the keep separate order. At most, these allegations amount to negligence, which is insufficient to state a claim. *McNeil v. Lane*, 16 F.3d 123, 124 (7th

6

Cir. 1994) ("Obduracy and wantonness rather than inadvertence or mere negligence characterize conduct prohibited by the Eighth Amendment."). Therefore, I will not allow Ray to proceed on this claim against the members of the review committee.

    Ray was frightened by the inmate's threats and asked to see a mental health worker. He met with Mental Health Professional Beck. He told Beck that he was seeing dead family members, and they were telling Ray to come join them. He could not sleep or stop worrying. Ray told Beck that the voices were telling Ray to hurt himself and others. Beck gave Ray some work packets to do and told him that, if he cut his light out and turned his television off at night, he would eventually fall asleep. Ray explained that he did not have a television, and he had a cellmate so he could not always control the lights. Beck told Ray he would have to find ways to make himself fall asleep but ignored Ray's comments about seeing dead people and hearing voices. Ray was not placed on suicide watch. His mental health code was not changed. He was not placed on any medication for his mental health needs. Ray became more depressed and suicidal. Ray claims Beck left him to fall into a deeper depression and attempt suicide. Ray provides no details regarding any suicide attempts.

    Under the Eighth Amendment, inmates are entitled to constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability, a prisoner must satisfy both an objective and subjective component by showing: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that medical need. *Farmer*, 511 U.S. at 834. A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment or one that is so obvious that even a

7

lay person would easily recognize the necessity for a doctor's attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Deliberate indifference means that the defendant "acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citation and quotation omitted). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal citation and quotation omitted). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (citation omitted), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

Here, Beck offered Ray some ideas to help him sleep and some work packets. Ray faults Beck for not doing more, but it cannot be plausibly inferred from the facts alleged in the amended complaint that Beck failed to use medical judgment in treating Ray. Therefore, I will not allow Ray to proceed against Mental Health Professional Beck.

The inmate that attacked and stabbed Ray on July 1, 2022, signed up for an "RWI" program and he was moved to participate in that program. Ray does not describe the program in detail, but it is a program for people with addiction problems. On October 2, 2022, Ray was also moved to the RWI program even though he did not

8

sign up for the program and did not have an addiction problem. He was again placed in a cell near the inmate who attacked and stabbed him. While these allegations are troubling, Ray does not indicate who made the decision to move him or if this individual was aware of the keep separate order. Therefore, these allegations do not state a claim.

On November 18, 2022, Ray was stabbed by his cellmate. The cellmate indicated that he was ordered to do it for his "brother," prison slang for a fellow gang member, to finish the job he was paid to do on July 1, 2022. Following the attack, Ray received medical care and was again placed in administrative housing. Ray was charged with possessing the weapon that was used to stab him and found guilty. He is suing the review committee because their alleged failure to put the keep separate order in on Ray and the inmate who attacked and stabbed him on July 1, 2022, led to this attack by a different inmate. It is unclear how a "keep separate" order that did not include Ray's cellmate could have stopped this attack. Additionally, the amended complaint does not indicate who decided that Ray would move to the location where he was injured. Furthermore, there was no prior indication that Ray's cellmate would attack him, and for a failure to protect claim, there must be a specific, credible, and imminent risk of harm. *Gevas*, 798 F.3 at 481. Therefore, these allegations do not state a claim.

On March 7, 2023, before Ray was released from segregation for the weapons offense, he met with the DII review committee again. Ray says that the review committee knew that a gang had a hit on him since July 1, 2022, and he asked if they were going to transfer him to a secure facility. Snow asked Ray if he filed Prison Rape

9

Elimination Act, 34 U.S.C. §§ 30301–09 ("PREA") complaints against two of his officers so he would be transferred. Ray said he filed the reports because he was sexually violated. Snow said he could not justify transferring Ray. After this conversation, Ray believed that not placing the keep separate order, housing him near the inmate who attacked and stabbed him, and not transferring him to another facility despite knowing there was a hit on him were all done as retaliation for filing PREA reports. He is suing each member of the review committee for the alleged retaliation.

To state a First Amendment retaliation claim, an inmate must allege: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Whitfield v. Spiller*, 76 F.4th 698, 707–08 (7th Cir. 2023) (citation omitted). Filing a PREA complaint is protected First Amendment activity, and the retaliatory acts alleged by Ray would likely deter someone from engaging in future First Amendment Activity. So, to state a claim, Ray needs to plausibly allege that his First Amendment activity was a motivating factor for the alleged retaliatory actions. Snow's comments permit a plausible inference that he was motivated to take the actions because of Ray's First Amendment activities. Therefore, Ray may proceed on a retaliation claim against Snow. He cannot, however, proceed against the other members of the review committee because he has not alleged facts from which it can be plausibly inferred that they were motivated to act based on Ray's First Amendment activity.

Ray was released from segregation on March 17, 2023, and assigned to the "JHU" dorm. By this time, most of the staff and inmates at MCF knew there was a hit on Ray. When he entered the dorm, inmates began saying that he was the guy with the hit on him. They argued about who was going to hurt Ray and collect the money. The inmate that Ray was assigned to share a cell with would not allow Ray to move into the cell. He asked Prison Guard Throneberry if he heard what the inmates were saying, and he explained that he was going to end up losing his property or getting hurt when inmates come after Ray. He indicated that, before he would let that happen, he would "fxxk dude (Ray) up himself." ECF 38 at 10. The inmate was removed from the cell. Ray was placed in the cell. Then the inmate was forced to return to the cell with Ray. Neither the inmate nor the cell were checked for weapons. When Prison Guard Throneberry left, Ray's cellmate attacked him and threatened him with a weapon, demanding that Ray give him his property. Ray does not describe his injuries, but he received medical care following the attack. He may proceed against Prison Guard Throneberry on a failure to protect claim.

Ray was next moved to the HHU dorm. On April 28, 2023, he was moved back to the JHU dorm. When he entered the dorm, Prison Guard St. Clair heard inmates threaten Ray and talk about collecting the money that was on him. St. Clair said she would inform her supervisor of what was being said to try to get him some protection. Around 1:00 a.m. on April 28, 2023, Ray asked St. Clair what her supervisor said. She indicated that someone would be by to talk to him before the dorm went to breakfast.

11

Around 4:00 a.m., Prison Guard Hensley and John Doe came to Ray's cell door. They were not wearing body cameras. They were talking loudly, knowing the whole dorm would hear them. Prison Guard Hensley said that Ray had a hit on him, and he should stop running because he cannot run from it for fifty years. Prison Guard Hensley said that Ray now needs her officers' help, but he should have thought about that before he filed PREA complaints against them. The John Doe officer said that Ray was not coming out of his cell until his door opened along with the other inmates' doors for breakfast. Prison Guard Hensley and the John Doe officer wished Ray good luck and left. Seeing that officers did not care about Ray's safety and seemed to be encouraging an attack, his cellmate stabbed Ray five times so he could collect the money on Ray. I will allow Ray to proceed against Prison Guard Hensley and the John Doe officer for deliberate indifference to his safety, in violation of the Eighth Amendment. He may also proceed against Prison Guard Hensley on a retaliation claim.

When St. Clair did her rounds, she saw that Ray was bleeding. She asked Ray where the weapon was and saw it on the ground. Instead of securing the weapon, she ran off, leaving Ray injured in the cell with his assailant. Ray's cellmate picked up the weapon and stabbed him at least three more times, saying he was going to kill him. Ray's cellmate dropped the weapon when he heard officers approaching. Ray was taken for medical care and then housed in segregation. He was charged with possessing the weapon that was used to stab him and found guilty. Ray is suing St. Clair for running away instead of securing the weapon. The facts, however, do not support a plausible inference that she was acting in conscious disregard of Ray's safety. I've

12

already explained that officers may act with due regard for their own safety. *See Shields*, 664 F.3d at 181. She was not required to open the cell to retrieve the weapon without first securing backup. At most, St. Clair was negligent, and that is insufficient to state a claim. *See McNeil*, 16 F.3d at 124. Therefore, Ray may not proceed against Prison Guard St. Clair.

Ray has named Warden English as a defendant and alleges that he knew that there was a hit on Ray because Ray filed a classification appeal seeking a transfer, and Warden English denied the transfer. The transfer was denied because Ray's safety was tied to his conduct history. Ray believes Warden English was referring to the weapons charge where he was found guilty of possessing the weapon that was used to stab him. Ray is also suing Jack Hendrix (the Director of Classification), Tobin (the Supervisor of Classification), and UTM Dwyer for denying his classification appeals seeking a transfer. Ray alleges that the each knew that a gang had a hit on him and he would be assaulted if he stayed at MCF.

Ray is entitled to be housed in a manner that is consistent with the Eighth Amendment, but Ray is not entitled to any particular classification or prison assignment. *See DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) ("[P]risoners possess neither liberty nor property in their classifications and prison assignments."); *Healy v. Wisconsin*, 65 Fed.Appx. 567, 568 (7th Cir. 2003) ("[I]nmates do not have a protected liberty interest in a particular security classification.") (citing *Sandin v. Conner*, 515 U.S. 472, 486 (1995)). Ray, however, filed his amended complaint in August 2025, and he does not describe any assaults by inmates occurring after April 2023. Based on

the factual allegations in the amended complaint, it cannot be plausibly inferred that Ray has not been and is not being housed at MCF in a manner that is inconsistent with the Eighth Amendment.

Ray is also suing Warden English because he is "legally responsible for the operation of Miami Correctional Facility and the welfare of all the inmates of that prison." ECF 38 at 12. There is no general respondeat superior liability under 42 U.S.C. § 1983. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). "[P]ublic employees are responsible for their own misdeeds but not for anyone else's." *Id.* at 596. To be held liable, a supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (citation omitted). There are not factual allegations in the amended complaint from which it can be plausibly inferred that Warden English facilitated, approved, condoned, or turned a blind eye to any violation of Ray's constitutional rights. Therefore, Ray may not proceed on any claims against Warden English in his individual capacity. However, Warden English will remain a party to this action in his official capacity for purposes of identifying the Doe defendants that Ray is being allowed to proceed against.

Prison Guard T. Worden is listed as a defendant, but Ray does not mention him in the body of the complaint. He will be dismissed because there are no facts from which it can be plausibly inferred that Prison Guard T. Worden violated Ray's rights.

Ray indicates that he has spent approximately three years in solitary confinement. He claims that several other retaliatory acts have occurred. His genitals

14

were sprayed with mace three times in a single day. He was dropped on his face by officers who then refused to call for medical assistance. Being in segregation limits his law library access and thereby thwarts his litigation efforts. He only receives one flex pen a month and it runs out of ink quickly. Officers put foreign objects in his food. An officer "accidently on purpose" opened his cell door, which ended in force being used against Ray. ECF 38 at 13. Ray notes that he has raised some of these issues in other lawsuits, but he does not connect any of these allegations to specific defendants named in this action. Therefore, he will not be allowed to proceed on these claims here.

Finally, I must address Ray's motion seeking counsel. ECF 37. I denied Ray's last request for counsel on May 22, 2025, noting that he had not demonstrated that he had attempted to obtain counsel on his own. ECF 32. That order indicated that, once his case had been screened, he would be sent ten (10) copies of the screening order so he could include them with a letter to ten individual attorneys asking for representation. Ray was invited to renew his request *after* he had attempted to find an attorney to represent him. Ray indicates that he has attempted to find an attorney to represent him, but he was told that he should wait for the case to be screened and include copies of the court's screening order with his requests for representation. He did not do this. Therefore, his motion will be denied, and the Clerk will be directed to mail Ray ten copies of this screening order to include with his requests for representation.

For these reasons, the court:

(1) DENIES William James Ray's Motion for Counsel (ECF 37);

15

(2) DIRECTS the clerk to mail William James Ray ten (10) copies of this screening order to include with his requests for representation;

(3) GRANTS William James Ray leave to proceed against John Doe Aramark Employee/Worker in his individual capacity for compensatory and punitive damages for deliberately leaving the area where Ray was located on July 1, 2022, knowing that inmates were threatening to assault him and for the purpose of allowing the assault to occur, in violation of the Eighth Amendment;

(4) GRANTS William James Ray leave to proceed against Prison Guard Snow in his individual capacity for compensatory and punitive damages for retaliating against him for making PREA complaints by not placing the "keep separate" order, housing him near the inmate who attacked and stabbed him on July 1, 2022, and not transferring him to another facility despite knowing there was a hit on him, in violation of the First Amendment;

(5) GRANTS William James Ray leave to proceed against Prison Guard B. Throneberry in his individual capacity for compensatory and punitive damages for failing to protect him from an attack on March 17, 2023, by his cellmate after hearing threats to harm Ray due to the hit placed on him on July 1, 2022, directly from that cellmate when placing Ray in the cell, in violation of the Eighth Amendment;

(6) GRANTS William James Ray leave to proceed against Lieutenant/Prison Guard Hensley and the John Doe Prison Guard present with Lieutenant/Prison Guard Hensley around 4:00 a.m. on April 28, 2023, in their individual capacities for

16

compensatory and punitive damages for deliberate indifference to Ray's safety, in violation of the Eighth Amendment;

(7) GRANTS William James Ray leave to proceed against Lieutenant/Prison Guard Hensley in his individual capacity for compensatory and punitive damages for retaliating against Ray for filing PREA complaints by failing to address his need for protection on April 28, 2023, in violation of the First Amendment;

(8) GRANTS William James Ray leave to proceed against Warden Bryan English in his official capacity solely for purposes of identifying two Doe defendants:

a. the John Doe Aramark Employee/Worker assigned to supervise in the kitchen on July 1, 2022, and who left the room immediately prior to Ray being attacked; and

b. the John Doe defendant who was present with Lieutenant/Prison Guard Hensley on April 28, 2023, when Hensley went to Ray's cell around 4:00 a.m. to discuss Ray's security concerns;

(9) DISMISSES all other claims;

(10) DISMISSES Jane Doe Aramark Employee/Worker, John or Jane Doe Aramark Employee/Supervisor, John or Jane Doe Prison Guard/Yard/Sort Officer, Jane Doe Prison Guard/Medical Officer, Mental Health Professional Beck, United Team Manager/Prison Guard Dwyer, Case Manager/Prison Guard Keller, Lieutenant/Prison Guard Myers, Prison Guard T. Worden, Prison Guard V. St. Clair, Supervisor of Classification Tobin; and Executive Director of Classification Jack Hendrix;

(11) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Prison Guard Snow, Prison Guard B. Throneberry, Lieutenant/Prison Guard Hensley, and Warden Brian English at the Indiana

Department of Correction, with a copy of this order and the amended complaint (ECF 38);

(12) ORDERS the Indiana Department of Correction to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information; and

(13) Waives Warden Brian English's obligation to file an answer to the amended complaint;

(14) ORDERS Warden Brian English to appear and, after reviewing this order and the amended complaint, identify:

>a. the John Doe Aramark Employee/Worker assigned to supervise in the kitchen on July 1, 2022, and who left the room immediately prior to Ray being attacked; and
>
>b. the John Doe defendant who was present with Lieutenant/Prison Guard Hensley on April 28, 2023, when Hensley went to Ray's cell around 4:00 a.m. to discuss Ray's security concerns;

by or before **March 23, 2026**, or show cause why he is unable to do so;

(15) DIRECTS the clerk to e-mail a copy of this order and the amended complaint to Warden Brian English alerting him to the **March 23, 2026**, deadline; and

(16) ORDERS, under 42 U.S.C. § 1997e(g)(2), Prison Guard Snow, Prison Guard B. Throneberry, and Lieutenant/Prison Guard Hensley to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

SO ORDERED on February 23, 2026.

/s/ Philip P. Simon
JUDGE
UNITED STATES DISTRICT COURT